No. 25-5335

# United States Court of Appeals for the Ninth Circuit

ELIZABETH DE COSTER; MAYA GOLD; OSAHON OJEAGA;
KENNETH DAVID WEST; EMMA ZABALLOS, on Behalf of Themselves
and All Others Similarly Situated,

*Plaintiffs-Respondents,*

– v. –

AMAZON.COM, INC.,

*Defendant-Petitioner.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF WASHINGTON IN NO. 2:21-CV-00693
HONORABLE JOHN H. CHUN, DISTRICT JUDGE

## ANSWER TO PETITION FOR PERMISSION TO APPEAL PURSUANT TO FED. R. CIV. P. 23(f)

WARREN D. POSTMAN
ROSEANN R. ROMANO
KELLER POSTMAN LLC
1101 Connecticut Avenue, NW,
   Suite 1100
Washington, DC 20036
(202) 918-1123

STEVE BERMAN
BARBARA MAHONEY
HAGENS BERMAN SOBOL SHAPIRO, LLP
1301 2nd Avenue, Suite 2000
Seattle, Washington 98101
(206) 623-7292

ADAM WOLFSON
QUINN EMANUEL URQUHART
   & SULLIVAN, LLP
865 Figueroa Street, 10th Floor
Los Angeles, California 90017
(213) 443 3000

ASHLEY C. KELLER
KELLER POSTMAN LLC
2333 Ponce De Leon Boulevard,
   Suite R-240
Coral Gables, Florida 33134
(833) 633-0118

ZINA BASH
JESSICA BERINGER
SHANE KELLY
KELLER POSTMAN LLC
150 North Riverside Plaza,
   Suite 4100
Chicago, Illinois 60606
(312) 741-5220

DAVID M. COOPER
QUINN EMANUEL URQUHART
   & SULLIVAN, LLP
295 Fifth Avenue
New York, New York 10016
(212) 849-7141

*Counsel for Plaintiffs-Respondents*

 COUNSEL PRESS   (800) 4-APPEAL • (384836)

## TABLE OF CONTENTS

INTRODUCTION ......................................................................................4

QUESTION PRESENTED ......................................................................5

RELEVANT BACKGROUND ................................................................6

    A. Plaintiffs Show Antitrust Injury as a Result of Amazon's Price Parity Policy. ..................................................................................6

    B. The District Court's Class Certification Decision Was Rigorous and Correct. ....................................................................................9

ARGUMENT ........................................................................................10

   I. Amazon Has Not Met the Standard for Interlocutory Review. ..................10

    A. The Class-Certification Order Does Not Create a Death-Knell Situation for Amazon. ...........................................................11

    B. This Case Presents No Unsettled and Fundamental Issue of Class Action Law, Let Alone Any Important to Future Litigation and Likely to Evade End-of-Case Review. .................................12

    C. The District Court Did Not Commit Manifest Error. ...........................20

CONCLUSION .....................................................................................27

CERTIFICATE OF COMPLIANCE ...................................................28

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*In re Asacol Antitrust Litig.*,
  907 F.3d 42 (1st Cir. 2018) ................................................................16

*Bateman v. Am. Multi-Cinema, Inc.*,
  623 F.3d 708 (9th Cir. 2010) ............................................................11

*Black Lives Matter L.A. v. City of L.A.*,
  113 F.4th 1249 (9th Cir. 2024) ...........................................................9

*Chamberlan v. Ford Motor Co.*,
  402 F.3d 952 (9th Cir. 2005) ....................................4, 5, 10, 11, 19, 20

*Comcast Corp. v. Behrend*,
  569 U.S. 27 (2013) ......................................................................14, 15

*Ellis v. Costco Wholesale Corp.*,
  657 F.3d 970 (9th Cir. 2011) ............................................................18

*FTC v. Amazon.com, Inc.*,
  No. 2:23-cv-01495 (W.D. Wash. filed Sept. 26, 2023) ....................11

*Microsoft Corp. v. Baker*,
  582 U.S. 23 (2017) ......................................................................10, 11

*In re Mortg. Elec. Registration Sys., Inc.*,
  754 F.3d 772 (9th Cir. 2014) ............................................................14

*Nutraceutical Corp. v. Lambert*,
  586 U.S. 188 (2019) ..........................................................................11

*Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*,
  31 F.4th 651 (9th Cir. 2022) ...............................12, 13, 15, 16, 20, 26

*In re Rail Freight Fuel Surcharge Antitrust Litig.*,
  934 F.3d 619 (D.C. Cir. 2019) ..........................................................16

*Shroyer v. New Cingular Wireless Servs., Inc.*,
  498 F.3d 976 (9th Cir. 2007) ............................................................19

*TransUnion LLC v. Ramirez,*
594 U.S. 413 (2021)........................................................................26

*Tyson Foods, Inc. v. Bouaphakeo,*
577 U.S. 442 (2016)..................................................................13, 20

*In re Valve Antitrust Litig.,*
780 F. Supp. 3d 1110 (W.D. Wash. 2024) .........................................22

*Wal-Mart Stores, Inc. v. Dukes,*
564 U.S. 338 (2011)........................................................................18

*Wolfire Games, LLC v. Valve Corp.,*
No. 24-7498 (9th Cir. Jan. 23, 2025) ..................................................4

## Other Authorities

Amazon, *Annual Report* 2 (2024)........................................................11

Fed. R. Civ. P.
23....................................................................................5, 9, 12, 20
23(a) .............................................................................................9, 19
23(b)....................................................................................................9
23(f)............................................................ 4, 5, 10, 13, 19, 20, 27

## INTRODUCTION

This Court grants Rule 23(f) petitions "sparingly" in "exception[al]" cases. *Chamberlan v. Ford Motor Co.*, 402 F.3d 952, 959 (9th Cir. 2005) (per curiam). The Court has identified three circumstances that warrant this "rare occurrence," and none applies here. *Id.*

Amazon makes only a token effort to argue otherwise. It suggests there is some pressure to settle but does not claim class certification is a "death knell." Amazon suggests there are disputes of law but fails to identify any legally erroneous statement in the District Court order, let alone explain how any legal dispute will evade end-of-case review. And Amazon suggests there are factual errors in the District Court's analysis but does not claim they meet the high bar for "manifest error." Instead, Amazon resorts to the idea that because this is a big class action and there are factual disputes about Plaintiffs' expert model, it is entitled to interlocutory appeal under Rule 23(f). That is wrong as a matter of law, and indeed, this Court recently denied a Rule 23(f) petition taking this same, misguided approach. *See Wolfire Games, LLC v. Valve Corp.*, No. 24-7498 (9th Cir. Jan. 23, 2025).

*First*, this is not a "death-knell situation." *Chamberlan*, 402 F.3d at 959. Amazon is a $2.4 *trillion* company. Amazon thus did not and cannot show "that it lacks the resources to defend this case to a conclusion and appeal if necessary or that doing so would 'run the risk of ruinous liability,'" as required for Rule 23(f) review

under the death-knell prong. *Id.* at 960 (quoting Fed. R. Civ. P. 23(f) advisory committee's note to 1998 amendment).

*Second*, none of the record-specific issues Amazon labels as "errors" constitutes an "unsettled and fundamental issue of law relating to class actions" that is "likely to evade end-of-the-case review." *Id.* at 959. The District Court's thorough decision applies well-established precedent to fact-specific expert testimony. Amazon's invitation to second-guess the District Court's scrutiny of that expert testimony would not "settle" any open legal questions or offer guidance in future class actions.

*Third*, Amazon does not assert and cannot show that the District Court's certification decision is "manifestly erroneous." *Id.* The District Court rigorously addressed each Rule 23 prerequisite, analyzed and assessed common issues and evidence, and squarely grappled with Amazon's record-specific, factual arguments in its 50-page certification decision and the inextricably entwined 24-page *Daubert* order that Amazon fails even to mention. The District Court's decision was correct and well within its discretion. The Court should deny the Petition.

## QUESTION PRESENTED

Whether this Court should deny permission to appeal under Rule 23(f) where Petitioner merely seeks fact-bound error correction of a straightforward application of the settled class-certification standard.

# RELEVANT BACKGROUND

## A.  Plaintiffs Show Antitrust Injury as a Result of Amazon's Price Parity Policy.

Amazon is a monopolist.  Plaintiffs are consumers who purchased goods from third-party sellers on Amazon's online marketplace.  Pet.App.1-2; *see also* Dkt. 419 (redacted version).  They allege antitrust injuries stemming from inflated "referral fees," charged on every purchase of a physical retail good sold on Amazon's marketplace by a third-party seller.  Pet.App.28.  Amazon maintains those inflated fees through an anti-discounting ("parity") policy, which it imposes on *all* sellers on Amazon's marketplace to follow.  One principal way Amazon enforces its parity policy is to remove from the "Buy Box" seller offers that are priced even one cent higher on Amazon than on competing websites.  *Id.* 14.  Because virtually all sales on Amazon are made through the Buy Box, *id*. 15, Buy Box removal is a powerful weapon.  Amazon's restraints, together over the Class Period, have the economic effect of a Platform Most Favored Nation ("PMFN") policy.  They encourage sellers to treat the Buy Box price as the market's price floor despite competing marketplaces' attempts to encourage more competitive prices on their sites by offering lower referral fees than Amazon, and this allows Amazon to pocket supracompetitive fees.

For years, Amazon's Business Solutions Agreement with third-party sellers included a Price Parity Clause, which explicitly required sellers to sell on Amazon

6

at the same or a lower price as their price on other platforms. *Id.* 15. To scale price parity enforcement, in 2015, Amazon began automatically removing the Buy Box for uncompetitively priced third-party offers. Internally, Amazon described Buy Box removal (which it later renamed Select Competitor Featured Offer Disqualification ("SC-FOD")) as a "faster mechanism to *price parity*." *Id*. 16-17 (emphasis added). Finding it an effective means to prevent external competition, Amazon expressly included Buy Box removal among the stated penalties for two other contract provisions Plaintiffs challenge: the Marketplace Fair Pricing Policy ("MFPP") added in 2017 and Amazon Standards for Brands ("ASB") added in 2018. *Id*. 14-15. Amazon is thus contractually permitted to remove any seller's offer from the Buy Box (and tank its sales) under the MFPP, if the seller's price is "significantly higher" than a price "off Amazon" and to remove any brand seller's offer under ASB if Amazon finds lower external prices. *Id*.[1] In 2019, after intense regulatory scrutiny, Amazon removed the Price Parity Clause from the BSA. But SC-FOD, ASB, and the MFPP remain in force. In 2021, Amazon posted a "clarification" that offering discounts on competing platforms without offering the same discount on Amazon violates the Seller Code of Conduct. *Id*. 5.

---

[1] Amazon estimates "over 2 million" sellers are brands. Dkt. 239 ¶ 12.

Plaintiffs' expert is Dr. Parag Pathak, a professor of economics at MIT and the 2018 winner of the prestigious John Bates Clark Medal, whose past recipients include economic legends Milton Friedman (1951) and Lawrence Summers (1993). Dr. Pathak's report demonstrates that Amazon's restraints have the economic impact of a PMFN and every class member suffered a common antitrust injury: as part of their purchase price, they paid a portion of Amazon's inflated referral fees. *Id.* 28.

Dr. Pathak's analytical and empirical work was extensive. After reviewing the record of the challenged restraints, making findings about enforcement and compliance and referral fee levels, he selected a PMFN analytical framework to assess Amazon's conduct. Resp.App.17-19. He applies the seminal Boik and Corts PMFN model to Amazon's 34 billion third-party seller transactions, *id.* at 8-9; Pet.App.9, which is a strategic decision-making model constructed from axiomatic principles of economics (Amazon calls them "assumptions") to demonstrate the PMFN's effects and estimate its impact on referral fees and consumer prices. Dr. Pathak's additional empirical analyses corroborate the model's results. His yardstick analysis demonstrates Amazon's referral fees are inflated within a range that the model predicts, Resp.App.13; his regression models separately demonstrate the model's prediction that higher fees cause sellers to raise prices, Pet.App.32; and his analysis of how Amazon used its policies to block price competition from rival online marketplaces like Jet.com accord with the model's prediction of reduced

marketplace competition, *id.* 29-30, 42-43. Lodging arguments nearly identical to those it raises here, Amazon challenged the reliability of Dr. Pathak's model and his regression analyses in a *Daubert* motion, which the District Court denied in a thoroughly reasoned 24-page opinion. Amazon has chosen not to even mention the *Daubert* decision in its Petition.

## B. The District Court's Class Certification Decision Was Rigorous and Correct.

On August 6, the District Court certified the following class: "All persons in the United States who on or after May 26, 2017, purchased five or more new, physical goods from third-party sellers on Amazon's marketplace." Pet.App.6. It set forth the correct legal standards, including that Plaintiffs "must 'affirmatively demonstrate' by a preponderance of actual evidence" that they satisfy each of the four requirements of Rule 23(a) and at least one requirement of Rule 23(b). *Id.* 7 (quoting *Black Lives Matter L.A. v. City of L.A.*, 113 F.4th 1249, 1258 (9th Cir. 2024)). It also noted that "[a]lthough the Court deemed [Dr. Pathak's] arguments admissible under *Daubert*, the Court's inquiry does not end there." Pet.App.31. Then it provided a detailed analysis of Plaintiffs' evidence and the Parties' arguments for each of the applicable Rule 23 prerequisites, even those Amazon did not challenge. After exhaustively reviewing Plaintiffs' evidence and each of Amazon's arguments on the disputed commonality and predominance requirements, including by assessing the weight and sufficiency of Dr. Pathak's model and opinions, *id.* 10-

9

44, the District Court held that Plaintiffs "met their burden by a preponderance of the evidence," *id.* 44.

## ARGUMENT

### I.   Amazon Has Not Met the Standard for Interlocutory Review.

Amazon ignores the procedural posture of its Petition in hopes this Court will hear case-specific, routine, and inaccurate claims of error.  But this Court disfavors Rule 23(f) petitions because they are "'disruptive, time-consuming, and expensive,' . . . add to the heavy workload of the appellate courts, require consideration of issues that may become moot, and undermine the district court's ability to manage the class action." *Chamberlan*, 402 F.3d at 959 (citations omitted).  "Bearing in mind that . . . class certification decisions 'present familiar and almost routine issues that are no more worthy of immediate appeal than many other interlocutory rulings,'" this Court adopted the following criteria to limit review to "rare cases":

> (1) there is a death-knell situation for either the plaintiff or defendant that is independent of the merits of the underlying claims, coupled with a class certification decision by the district court that is questionable; (2) the certification decision presents an unsettled and fundamental issue of law relating to class actions, important both to the specific litigation and generally, that is likely to evade end-of-the-case review; or (3) the district court's class certification decision is manifestly erroneous.

*Id.*[2] "Employing [those] guidelines," Amazon's "application for permission to appeal should be denied." *Id.* at 955.

### A. The Class-Certification Order Does Not Create a Death-Knell Situation for Amazon.

Amazon does not argue that the District Court's certification decision represents a "death-knell situation." The company has not put forth "declarations, documents, or other evidence" regarding its financial condition, as required, to show overwhelming settlement pressure—and in fact, there is no evidence it feels such pressure. *Chamberlan*, 402 F.3d at 960. And it would strain credulity for the largest retail company in the world, with over $2.4 *trillion* in market value and a reported $638 billion in 2024 revenue, to claim "it lacks the resources to defend this case" or "run[s] the risk of ruinous liability." *Id.*; Amazon, *Annual Report* 2 (2024), https://s2.q4cdn.com/299287126/files/doc_financials/2025/ar/Amazon-2024-Annual-Report.pdf [https://perma.cc/LYX2-8Q4C]; *Bateman v. Am. Multi-Cinema, Inc.*, 623 F.3d 708, 723 (9th Cir. 2010) (rejecting "ruinous liability" where defendant offered no evidence). Regardless of the outcome of the certification order, Amazon

---

[2] Amazon relies on *Microsoft Corp. v. Baker*, 582 U.S. 23 (2017), to contend this Court may grant review based on "any consideration." Pet.10-11. But as a later Supreme Court decision confirms, "Rule 23(f)" is "the product of careful calibration." *Nutraceutical Corp. v. Lambert*, 586 U.S. 188, 196 (2019) (quoting *Baker*, 582 U.S. at 40). "Justification for immediate appeal must be sufficiently strong to overcome the usual benefits of deferring appeal until litigation concludes." *Id.* (cleaned up). In any event, Amazon does not identify what other consideration this Court should rely on other than its bare assertions of error.

independently faces claims from 20 Attorneys General and the FTC based on the same allegations and will therefore have to continue to litigate the issues underlying this case. *See, e.g.*, *FTC v. Amazon.com, Inc.*, No. 2:23-cv-01495 (W.D. Wash. filed Sept. 26, 2023) (joined by Attorneys General). The "death-knell" factor does not provide a basis to grant the Petition.

**B.** **This Case Presents No Unsettled and Fundamental Issue of Class Action Law, Let Alone Any Important to Future Litigation and Likely to Evade End-of-Case Review.**

Amazon declares that the certification order "presents an unsettled and fundamental issue of law relating to class actions," Pet.11, but identifies no such issue of law. The certification order undisputedly applied the correct legal standards in deciding commonality and predominance: it recognized "plaintiffs must affirmatively demonstrate by a preponderance of actual evidence that they satisfy all the Rule 23 prerequisites," Pet.App.7 (cleaned up); it found Plaintiffs met this preponderance standard in showing the existence of a PMFN policy, *id.* 12, 21; it found Plaintiffs' expert satisfied *Daubert* and also that "the Court's inquiry does not end there," *id.* 31; and it found "Dr. Pathak's expert testimony can answer common questions of the entire class," a "reasonable juror could believe Dr. Pathak's expert testimony," and "Amazon's criticisms of Dr. Pathak's modeling . . . do not show that the challenged conduct is not capable of being measured on a class-wide basis," *id.* 36-37. Amazon does not identify any statement in the certification order that is

legally erroneous. Nor could Amazon do so, as the District Court's legal standards come directly from this Court's precedents. *See, e.g.*, *Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*, 31 F.4th 651, 663-65, 667-68, 681 (9th Cir. 2022).

Instead, Amazon's Petition rests on disagreements with Plaintiffs' expert and its belief that Plaintiffs will not be able to prove their case at trial. But that is not a basis for obtaining Rule 23(f) review. Indeed, this approach runs headlong into binding precedent from the Supreme Court and this Court, which establishes that the merits are relevant only insofar as they bear on certification—i.e., whether there are common issues or evidence capable of class-wide adjudication. *See Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 449 (2016) ("Once a district court finds evidence to be admissible, its persuasiveness is, in general, a matter for the jury. . . . The District Court could have denied class certification on this ground only if it concluded that no reasonable juror could have believed" the expert opinion.); *Olean*, 31 F.4th at 667 (applying rule). Thus, it is not for the District Court (or this Court) to predict whether that common evidence will ultimately prove Plaintiffs' common injury or whether a jury will side with Amazon.

While Amazon attempts to concoct legal disputes from the District Court's application of well-settled law to the particular facts, those attempts are meritless.

*First*, Amazon asserts that an entirely "theoretical" model that "always finds injury" and is filled with "false positives" cannot support class certification. Pet.12-16. The District Court did not suggest otherwise. Rather, it found Dr. Pathak's opinions and modeling are not just theoretical, do not just assume a conclusion of injury, and do not contain false positives. Pet.App.25-38. Amazon ignores that the District Court also rejected these arguments in its *Daubert* opinion, which Amazon does not contest. And while Amazon argues that Dr. Pathak's model fails the predominance requirement, Amazon does not argue—nor could it—that no reasonable juror could accept Dr. Pathak's common evidence of injury to all or virtually all class members. And that is the relevant legal test. Thus, Amazon does not even argue that it defeats class certification under the governing legal standard, let alone that there is a legal dispute for this Court to resolve. In any event, there is no error in the District Court's factual analysis, as discussed *infra* pp. 21-22.

*Second*, Amazon argues for the first time that *Comcast* precludes certification because an alleged "mismatch between the damages model . . . and plaintiffs' liability theory" attributes "damages that are not the result of the wrong." Pet.21-22 (citing *Comcast Corp. v. Behrend*, 569 U.S. 27, 37 (2013)). "[A]rguments not raised in the district court will not be considered for the first time on appeal." *In re Mortg. Elec. Registration Sys., Inc.*, 754 F.3d 772, 780 (9th Cir. 2014). Amazon does not attempt to explain how this purported "problem" is tied to "the revised class

definition," i.e., the five-purchase minimum, such that Amazon could not have presented this argument to the District Court. Pet.21. Thus, having failed to raise the argument below, it is now waived.

Regardless, Amazon's new argument fails. *Comcast* rejected a damages model because, after the lower court dismissed certain theories of liability, the proffered model was unable to parse damages solely attributable to the plaintiffs' remaining theory of liability. 569 U.S. at 36. But as the District Court's *Daubert* order observed, Plaintiffs' "model demonstrates how a PMFN increases platform and retail fees and measures whether prices would have been lower absent the PMFN." Resp.App.12. Thus, Plaintiffs' damages model is directly linked to their theory of liability.

It seems Amazon's real complaint is not a purported mismatch between the liability theory and the model, but whether the model may include some isolated *transactions* where sellers did not pass on higher prices to consumers. *See* Pet.21. This presents neither a *Comcast* problem nor any other ground for denying class certification. *See Olean*, 31 F.4th at 672 (affirming certification where evidence showed that class members made "*at least one* purchase above the predicted but-for price") (emphasis added). "[I]ndividualized differences among the [number of] overcharges imposed on each purchaser may require a court to determine *damages* on an individualized basis," but that is not grounds to deny certification. *Id.* at 679.

If credited at trial, the model proves that all or almost all consumers suffer antitrust injury, a common—and commonly disputed—question of fact.

*Third*, Amazon argues the District Court erred in certifying a class that includes "a great number" of uninjured people, in particular due to "focal-point pricing." Pet.20-21. But again, there was no dispute on the legal standard below, as Amazon accepted that "5-6% is the outer limit of permissible uninjured class members." Pet.App.23 (citing Dkt. 232 at 32). The District Court rejected Amazon's argument that "the challenged conduct did not have a widespread effect," *id.* 23, pointing to evidence showing that uninjured class members make up "less than 1% even under the most conservative assumptions," *id.* 24. To the extent Amazon now suggests even less than 1% uninjured class members precludes class certification, that argument is waived.

It is also meritless. As the District Court correctly concluded, courts routinely certify classes that include a greater percentage of uninjured members. *Id.* 25. *See, e.g.*, *Olean*, 31 F.4th at 672 (affirming certification of class where 5.5% were uninjured).[3] There is no special rule for extra-large classes that requires the court to consider the number (versus percentage) of uninjured class members. *Cf.* Pet.21.

---

[3] The cases Amazon cites involved a *much* larger proportion of uninjured class members. *See In re Rail Freight Fuel Surcharge Antitrust Litig.*, 934 F.3d 619, 623 (D.C. Cir. 2019) (12.7% uninjured); *In re Asacol Antitrust Litig.*, 907 F.3d 42, 46-47 (1st Cir. 2018) (approximately 10% uninjured).

Regardless, Amazon's premise that there are necessarily 0.6% uninjured class members due to focal-point pricing is erroneous. Dr. Pathak's analysis of 34 billion transactions shows that Amazon's PMFN caused referral fee overcharges on *every* transaction. Dr. Pathak did not "concede" any consumers were uninjured, *see* Pet.21; he addressed Amazon's (highly speculative and unrealistic) argument—that a seller at a focal-point price *might* not pass *any* portion of a referral fee reduction to consumers via lower prices—by employing "the most conservative assumptions," Pet.App.24 (quoting Dkt. 307-1 at 93 ¶ 265). And narrowing the class definition to class members with at least five purchases reduced the number of class members who could have potentially avoided overpayment to at most 0.6%. Amazon's conduct also deprived even those (theoretical) consumers of platform choice and forced them to transact on Amazon's lower-quality platform compared to what would have emerged in a competitive market. Dkt. 308 at 10 n.38. In any event, there is no dispute of law here.

*Fourth*, Amazon argues that the "class cannot be certified" because there were "different policies and practices" and "sellers' varied responses regarding how they set prices." Pet.22. A mere glance at Amazon's complaint reveals it to be one of fact, not law. The District Court found admissible, common evidence showing a PMFN policy applicable to all. Pet.App.11-22. Moreover, Amazon fundamentally mischaracterizes Plaintiffs' theory. This case is about platform-versus-platform

competition (e.g., Amazon versus Walmart). If Amazon's PMFN policy was sufficiently prevalent to harm competition from other platforms, then the result is higher referral fees for everyone, *regardless* of whether Amazon obtained 100% compliance from sellers. *Id.* 28-31, 34. Amazon's Petition does not dispute the District Court's findings that the PMFN affected platform competition or that this is a common question that can be resolved on a classwide basis. That should be the end of the matter.

The District Court also distinguished on the facts the two cases Amazon relies on here: *Wal-Mart Stores, Inc. v. Dukes* and *Ellis v. Costco Wholesale Corp. Id.* 21-22. In *Dukes*, the Supreme Court found that limited evidence consisting of statistical analyses, anecdotal reports, and expert opinion on a corporate culture of sex stereotyping was insufficient to establish a common policy of discrimination. 564 U.S. 338, 353-54, 358, 359 (2011). As the District Court found, "the nature and quality of evidence here [ ] markedly differs." Pet.App.22; *see also id.* 12-21 (discussing in detail the common evidence of Amazon's PMFN policy). To the extent Amazon contests this as a factual matter, there is no error, let alone manifest error, in the District Court's careful analysis of the record evidence. *See infra* pp. 20-21.

This case is also nothing like *Ellis*, 657 F.3d 970 (9th Cir. 2011). There, this Court vacated the lower court's commonality determination because it failed to

engage in the required "rigorous analysis." *Id.* at 984. Amazon's contrary assertion aside, Pet.24, *Ellis* did *not* consider the sufficiency of the evidence put forth to show a common policy, and accordingly, the case is irrelevant. Here, the District Court rigorously analyzed the evidence and arguments and applied the correct legal standards to reach its certification decision.

*Finally*, even if any of these issues could be repackaged as legal, fundamental, and unsettled (they are not), Amazon must still show they are "*likely* to evade end-of-the-case review." *Chamberlan*, 402 F.3d at 959 (emphasis added). Amazon offers *no reason* why its fact-specific objections could not be addressed by this Court in the ordinary course, including post-trial. Indeed, Amazon argued to the District Court that it may later move to decertify the class based on new evidence that is not yet part of the record. Hr'g Tr. 4:23-5:7 (Aug. 1, 2025). Amazon resorts to arguing that immediate review is necessary "given the exceptional size and breadth of the class." Pet.12. No case, ever, has suggested this is a valid basis for interlocutory review under Rule 23(f) precisely because class actions exist to redress *widespread* harms that are imposed in increments that are too small for any individual to sue over. *Shroyer v. New Cingular Wireless Servs., Inc.*, 498 F.3d 976, 992 (9th Cir. 2007). Though Amazon understandably wishes it were otherwise, this class is the poster child for numerosity, Fed. R. Civ. P. 23(a)(1), one of many reasons to eventually *affirm* the District Court's certification order after final judgment.

### C.    The District Court Did Not Commit Manifest Error.

Not even Amazon has the hubris to argue that the District Court's conscientious, 50-page certification decision, predicated on its meticulous 24-page *Daubert* order, was "manifestly erroneous and virtually certain to be reversed on appeal from the final judgment." *Chamberlan*, 402 F.3d at 962.  Amazon's Petition does not show that the District Court "applie[d] an incorrect Rule 23 standard or ignore[d] a directly controlling case," as required for manifest error. *Id.*  Nor could it.

Despite not asserting manifest error, Amazon throws the proverbial kitchen sink into its Petition.  None of the purported errors are "easily ascertainable from the petition itself," as is required to justify an interlocutory appeal under Rule 23(f) based on "manifest error." *Id.* at 959.  Moreover, the myriad factual disputes Amazon raises and the ultimate question whether "expert evidence[] is capable of showing class-wide impact" can be reviewed only for "abuse of discretion." *Olean*, 31 F.4th at 663.  Amazon does not argue that there was an abuse of discretion, let alone one so clear it constitutes manifest error.

In any event, Amazon's fact-bound arguments are erroneous and largely concern methodological debates about Dr. Pathak's opinions that (a) the District Court thoroughly addressed in an uncontested *Daubert* opinion; and (b) are the same for all class members and thus can be resolved on classwide basis. *See Tyson*, 577

U.S. at 457 ("[P]etitioner's primary defense was to show that Mericle's study was unrepresentative or inaccurate. That defense is itself common to the claims made by all class members.").

*First*, the District Court reviewed the extensive body of evidence drawn from internal company documents, employee testimony, third-party sellers, and experts to find that "common evidence . . . shows, on a more probable than not basis, that a PMFN policy exists."[4]  Pet.App.21.  In addition, the District Court considered common evidence that sellers complied with Amazon's PMFN and "other marketplace participants have a common understanding of Amazon's anti-discounting polic[ies]." *Id.* 19.  As discussed *supra* pp. 16-17, Amazon's suggestion that Plaintiffs had to show 100% compliance by every seller misunderstands how the antitrust injury occurred here through harm to platform competition.

In any event, the District Court credited evidence that Amazon *systemically* imposes its PMFN through its *standard* contract with *all* sellers, including through its use of SC-FOD, which applies to *every single* third-party seller. *Id.* 12-17, 34.  It found that Plaintiffs presented substantial evidence that Amazon intended to

---

[4] Amazon misrepresents the record when it claims that "[n]o evidence cited by the district court identifies a common policy of price parity or anti-discounting." Pet.23. For example, the PPC required third-party sellers to "maintain parity," Pet.App.13, and SC-FOD allowed Amazon to enforce price parity by removing "featured offer eligibility . . . when seller's prices on Amazon are higher than prices for offers at select competitors," *id.* 16.  Both policies applied to all third-party sellers.

effectuate a PMFN through enforcement of the challenged restraints, and that it was not necessary for Amazon to "enforce" its restraints 100% of the time because its monitoring and enforcement efforts already resulted in sellers complying 80% of the time (an occurrence *at odds* with the higher cost of selling on Amazon).[5]  *Id.* 12-21, 26, 34.  The District Court's conclusion is also consistent with other cases in this Circuit.  *See, e.g.*, *In re Valve Antitrust Litig.*, 780 F. Supp. 3d 1110, 1127 (W.D. Wash. 2024) (determining that the plaintiffs' evidence of certain contract terms, one-off discussions with third-party gaming companies, and various messages in industry forums established common evidence of the defendant's price parity expectation).

*Second*, Amazon's factual assertion that Plaintiffs' expert presented an "entirely theoretical" model is demonstrably false, as discussed *supra* pp. 7, 12-13. Pet.13.  Amazon's own expert confirmed that the Boik-Corts model that Dr. Pathak applied here is *the* accepted methodology for evaluating the effect of a PMFN policy. Resp.App.7.  Far from pure economic theory, Dr. Pathak applied this model to 34

---

[5] Amazon's contention that it has not scaled its enforcement to police every transaction totally misses the boat. Amazon does not even address Plaintiffs' evidence of sellers' systemic prophylactic compliance, which is the grounding feature of Plaintiffs' theory, and which animated the Court's opinion.  *See, e.g.*, Pet.App.34-35.  Amazon does not penalize sellers with Buy Box removal when the seller's offer is "price competitive," meaning Amazon did not identify the same product for a lower price off-Amazon. But in that circumstance, which is the case for **80%** of third-party seller transactions—the seller is *already complying* with the PMFN.

billion Amazon transactions. Pet.App.9. It hardly gets more empirical than that. And Dr. Pathak corroborated his model's findings of "antitrust injury" through (among other things) empirical regression analyses, which Amazon concedes are "typically used in antitrust cases." Pet.2. These regressions "confirm[] [Dr. Pathak's] model's predictions: lower referral fees lead to lower prices for consumers." Pet.App.31 (citing Dkt. 232 at 38).[6]

*Third*, the hodgepodge of factual objections Amazon raises about whether Dr. Pathak's model reflects economic reality are meritless. To start, Amazon's objection that the model improperly assumes that a PMFN "always leads to fee and price inflation," Pet.13-14 (quoting Dkt. 233 ¶ 401), overlooks that this is the consensus opinion of economists in the field, *see* Resp.App.7. Dr. Pathak also did not rest on this assumption but showed empirically "how a PMFN increases platform and retail fees and measures whether prices would have been lower absent the PMFN." Resp.App.12; *see also* Pet.App.17-19. In addition, Amazon's contention that Dr. Pathak's model improperly assumes the existence of a PMFN is a red herring. "[T]he model is not designed to detect the existence of a PMFN policy." Pet.App.35.

---

[6] Ironically, because Amazon's long-standing PMFN infects available data, no "clean" data exists to assess Amazon's conduct using only regression analyses. *See* Resp.App.12 n.6.

Plaintiffs showed the existence of a PMFN by a preponderance of the evidence separate and apart from the model. *Id.* 22.

As to Amazon's claim that the model does not reflect the record because it "does not have the same characteristics" as Amazon's PMFN, Pet.15, the District Court rejected this argument in its *Daubert* decision. Resp.App.16. ("Amazon's contention that Dr. Pathak's model is unreliable because the underlying assumptions do not reflect reality is unpersuasive."). The District Court held: "Dr. Pathak reviewed the facts and explained his basis for concluding that Amazon's anti-discounting policies act as a PMFN. Thus, Amazon's argument does not show that the economic model Dr. Pathak used is unreliable," Resp.App.13, or "that Dr. Pathak improperly extended the Boik-Corts model to the facts of this case," *id.* at 9.

While Amazon contends that the model assumes that the PMFN "constrains pricing for all possible sellers through all possible channels," Pet.15 (quoting Dkt. 233 ¶ 70), Dr. Pathak demonstrates through a variant of the Boik-Corts model that "regardless of the competitive conditions" sellers face, the "anti-discounting policies result in higher prices." Resp.App.9. The District Court credited Dr. Pathak's explanation that "[w]hen a dominant marketplace prevents merchants from offering discounts on other marketplaces," it affects merchant incentives, even among merchants that do not sell on the dominant marketplace, which in turn "distort[s] marketplace competition." Resp.App.16-17 (quoting Dkt. 307-2 at 61).

Next, Amazon argues that the model does not reflect "that sellers typically cannot respond" to Buy Box removal "by raising their prices off Amazon." Pet.15 (cleaned up). But that is Amazon's preferred factual narrative (*see id.* 11-12, setting forth a purported multi-step causation theory), not the purpose of the model or Plaintiffs' factual theory of harm, which is that Amazon's PMFN eliminates marketplace competition on referral fees by blunting marketplace price competition. Dr. Pathak's *empirical* analysis of Amazon's monitoring data confirms that across marketplaces, third-party sellers' pricing complies with Amazon's PMFN 80% of the time despite empirically verified, higher selling costs on Amazon relative to other marketplaces. Pet.App.17, 26. This blunting of competition enables Amazon to charge a supracompetitive referral fee on *every* third-party seller transaction, which systematically inflates sellers' prices.[7]

Amazon next complains that the model does not account for variation in "competitive conditions" across individual products. Pet.17. But as the District Court found, by estimating distinct counterfactual fees for each product category, Plaintiffs' model addresses inflated prices at the *same level* that Amazon sets its real-

---

[7] The District Court correctly noted that Dr. Pathak's regression models (Amazon's favorite economic tool) confirmed that sellers pass on some amount of that overcharge to customers by analyzing *all* the relevant data for product categories where Amazon had previously implemented a referral-fee reduction. Pet.App.32-33.

world referral fees. Pet.App.31 (citing Dkt. 262 at 162-63). And it is simply not the case that Dr. Pathak failed to address sellers' idiosyncratic pricing practices like "focal point pricing." Pet.17-18. Dr. Pathak acknowledged that such behavior may, theoretically, mean referral fees are not always passed on to class members. *See* Pet.App.23-24 (citing Dkt. 306 at 13). But given the frequency of consumer purchases, Dr. Pathak reasonably concludes that "even under the most conservative assumptions" "all or virtually all class members were harmed by the conduct." *Id.* 24 (quoting Dkt. 307-1 at 93). While Amazon strains to present this as a legal issue of standing, Pet.3, 20, the District Court's conclusion, Pet.App.33-38, 44, that the evidence is "capable of establishing antitrust impact on a class-wide basis" satisfies standing under *TransUnion LLC v. Ramirez*, 594 U.S. 413, 430-31 (2021), and *Olean*, 31 F.4th at 682.

*Fourth*, Amazon argues that the model cannot serve as common evidence of injury because so-called "placebo tests" conducted by Amazon's expert reported "false positives," i.e., finding injuries where no harmful conduct occurred. Pet.13. But the District Court correctly credited Dr. Pathak's response and rejected Amazon's expert's "flawed analytical approach." *See* Dkt. 307-1 ¶ 233. Amazon's expert forgot step one of Dr. Pathak's model (confirming that the data *was subject to* a PMFN), so he "simply input[] irrelevant data *as if* it were" subject to a PMFN. *Id.* ¶ 234; 35. So, it is no surprise that the "placebo tests" showed impact, particularly

given the European test data that Amazon's expert used for his placebo analysis was not "clean"—it was tainted by the same anticompetitive conduct alleged here. Resp.App.12 n.6.

*Finally*, Amazon claims that the District Court's commonality decision somehow "strips Amazon of th[e] right" to defend itself. Pet.24. But nothing prevents Amazon from offering evidence at trial (as it did on class certification) to dispute the existence of a *de facto* PMFN policy, sellers' compliance with it, and the antitrust injury to consumers. If Amazon is erroneously prevented from using the Rules of Evidence to make its case to the jury, it will have the right afforded to every litigant: appeal after an adverse judgment. What it cannot do is *predict* that it will labor under some error that has never occurred and use that forecast as a basis to obtain interlocutory review of a well-grounded class-certification order.

## CONCLUSION

The Court should deny Amazon's petition for permission to appeal under Rule 23(f).

## CERTIFICATE OF COMPLIANCE

I certify that this Response to Petition for Permission to Appeal complies with the type-volume limitation set forth in Fed. R. App. P. 5(c)(1) and 32(a)(5)(A). This Petition uses a proportional typeface and 14-point font, and contains 5,597 words.

Dated: September 2, 2025                          Respectfully submitted,

*/s/ Ashley C. Keller*

# Appendix

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| ELIZABETH DE COSTER *et al.*, on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>AMAZON.COM, INC., a Delaware corporation,<br><br>Defendant. | CASE NO. 2:21-cv-00693-JHC<br><br>~~SEALED~~ ORDER DENYING MOTION TO EXCLUDE EXPERT TESTIMONY |

**I**

**INTRODUCTION**

This matter comes before the Court on Defendant Amazon.com, Inc.'s Motion to Exclude Testimony of Parag Pathak, Ph.D.  Dkt. # 230 (sealed).  The Court has considered the materials filed in support of and in opposition to the motion, the rest of the file, and the governing law.  The Court finds oral argument unnecessary.  Being fully advised, for the reasons below, the Court DENIES the motion.

## II

### BACKGROUND

Plaintiffs sued Amazon.com, Inc., claiming that the company violated Sections One and Two of the Sherman Act. Dkt. ## 125 (sealed), 126 (redacted). They contend that Amazon denies customers the "benefits of lower prices and fees" that would arise in a competitive market; and they say Amazon does so by imposing on third-party sellers "Most Favored Nation" policies that cause customers to pay supra-competitive prices. Dkt. # 126 at 9 ¶ 15. Plaintiffs allege that Amazon's pricing policies prevent "third-party sellers from offering lower prices off of Amazon, and punish them for violations, which in turn insulates Amazon from competition from low cost, alternative platforms." *Id.*

Plaintiffs' economics expert Dr. Parag Pathak, Ph.D. is the Class of 1922 Professor of Economics at Massachusetts Institute of Technology. Dkt. # 262 (sealed) at 14 ¶ 1.[1] He is also a Research Associate at the National Bureau of Economic Research (NBER) and is the founding Director of the NBER's working group on market design. *Id.* Market design is a branch of microeconomics that focuses on the design and performance of market clearing institutions. *Id.* at 14 ¶ 2.

Dr. Pathak concludes that Amazon's anti-discounting policies and practices collectively function as a Platform Most Favored Nation (PMFN) restraint. Dkt. ## 262 (sealed) at 18–19 ¶ 30; 307-1 at 20 ¶¶ 44–54.[2] In his report, he says that Amazon's conduct prevents price competition with other online retailers, which in turn allows Amazon to charge "monopoly referral fees—i.e., the price of connecting merchants and consumers to each other and

---

[1] Plaintiffs submitted two praecipes to correct typographical errors in Dr. Pathak's report. Dkt. ## 192, 262. This Order cites the second revised report at Dkt. # 262.

[2] In his report, Dr. Pathak refers to the policies and practices Plaintiffs are challenging as Amazon's "anti-discounting policy" and "anti-discounting policies." Dkt. # 262 at 18 ¶ 29.

~~SEALED~~ ORDER DENYING MOTION TO
EXCLUDE EXPERT TESTIMONY - 2

Resp.App.2

completing the sales transaction between them." Dkt. # 262 at 22 ¶ 36. Dr. Pathak says that

Amazon is the largest online marketplace in the United States, with a market share of around

72% in the Online Retail Marketplaces Market. *Id.* at 64 ¶ 146. He explains that microeconomic

modeling shows that, "all else equal, a marketplace with market power (like Amazon) sets higher

fees when merchants are constrained by an anti-discounting policy than when they are not." *Id.*

at 23 ¶ 41. He says that in this situation, "because merchants cannot discount prices,

marketplaces have no reason to discount fees. Instead, the presence of the anti-discounting policy

incentives the marketplace to increase fees." *Id.* at 132 ¶ 339.

       Dr. Pathak determines that the higher fees charged by Amazon results in higher prices for

products purchased on Amazon. *Id.* at 25 ¶ 45. He also applies the model to transactional data

provided by Amazon to empirically assess the impact of the anti-discounting policies. *Id.* at 17

¶ 42. Dr. Pathak asserts that in a counterfactual world without Amazon's anti-discounting

policies, increased competition between companies in the Online Retail Marketplaces Market

would have resulted 12-20% lower fees, depending on the product category. *Id.* at 24 ¶ 42.

According to Dr. Pathak, Amazon's anti-discounting policies have thus harmed the class

members. *Id.* at 26 ¶ 48.

       Amazon moves to exclude Dr. Pathak's expert testimony. Dkt. # 230. The company

challenges Dr. Pathak's methodology, arguing that (1) the model Dr. Pathak used is not generally

accepted in the field of economics; (2) the model has an extraordinary error rate; (3) the model

rests upon unreliable and unfounded assumptions; and (4) the model ignores heterogeneity in

sellers' business strategies. *Id.* at 8–16. Amazon also contends that Dr. Pathak's regression

analyses are unreliable because the data sample is too small, and that his regressions do not show a relationship between fees and prices.  *Id.* at 16–18.[3]

**III**

**DISCUSSION**

A.    Legal Standards

Federal Rule of Evidence 702 governs the admissibility of expert testimony.  Under Rule 702, a witness "who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise" provided that

> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

---

[3] Plaintiffs filed a Surreply asking the Court to strike arguments Amazon raised for the first time in its Reply.  Dkt. # 337.  They also requested leave to respond to arguments based on Dr. Pathak's deposition testimony that Amazon cited for the first time in its Reply brief.  *Id.* at 2.

Plaintiffs request that the Court strike (1) Amazon's argument about pass-through rates in Dr. Pathak's formulas, (2) Amazon's contention that the outcome of a theoretical model is always predetermined, and (3) Amazon's argument that an ABA treatise rejects Dr. Pathak's approach because his model cannot account for heterogeneity.  *Id.* at 2–3.  Because these arguments were raised for the first time in a reply brief and the Order does not rely on any of these arguments, it need not rule on the request to strike.  *See Zamani v. Carnes*, 491 F.3d 990, 997 (9th Cir. 2007) ("The district court need not consider arguments raised for the first time in a reply brief."); *United States v. Romm*, 455 F.3d 990, 997 (9th Cir. 2006) ("[A]rguments not raised by a party in its opening brief are deemed waived.").

Regarding Plaintiffs' second request, they say that Amazon's Reply repeatedly cites Dr. Pathak's deposition that was taken after Amazon filed its Motion.  Dkt. # 337 at 3.  Plaintiffs contend that Amazon's Reply mischaracterizes Dr. Pathak's testimony, and they seek leave to submit excerpts from the deposition.  Given that Amazon's Reply cites this new material, and Plaintiffs did not have an opportunity to respond, the Court grants Plaintiffs' request and considers the deposition excerpts attached as Exhibit A to the Declaration of Steve Berman.  Dkt. # 338; *cf. Veritas Operating Corp. v. Microsoft Corp.*, No. C06-0703-JCC, 2008 WL 7404617, at *5 (W.D. Wash. Feb. 26, 2008) ("The Court is not persuaded to exclude Mr. Wagner's testimony on grounds of snippets of deposition testimony presented for the first time in a Reply, and to which Veritas has not had an opportunity to respond."); *Micromet AG v. Cell Therapeutics, Inc.*, No. C04-0290-RSM, 2006 WL 8454650, at *2 n.1 (W.D. Wash. Feb. 17, 2006) (in reaching its conclusion, "the Court did not consider the deposition testimony of Peggy Hawkins, as that was improperly raised for the first time in plaintiff's Reply brief").

Fed. R. Evid. 702.  Rule 702 was amended in 2023.  *See* Notes of Advisory Committee on 2023 Amendment to Rule 702.  The Advisory Committee Notes to the 2023 amendment state that the changes were intended to "clarify and emphasize" the plain language of Rule 702.  *Id.*  And "[n]othing in the amendment imposes any new, specific procedures."  *Id.*  Thus, cases interpreting Rule 702 that predate the 2023 amendment still apply.  *See Reflex Media, Inc. v. SuccessfulMatch.com*, 758 F. Supp. 3d 1046, 1049 (N.D. Cal. 2024).

Courts must ensure "that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand."  *Hyer v. City & Cnty. of Honolulu*, 118 F.4th 1044, 1055 (9th Cir. 2024) (quoting *Elosu v. Middlefork Ranch Inc.*, 26 F.4th 1017, 1024 (9th Cir. 2022)).  They have "broad discretion" in making such evidentiary rulings.  *Id.* (citing *City of Pomona v. SQM N. Am. Corp.*, 866 F.3d 1060, 1065 (9th Cir. 2017)).

Expert testimony is relevant if it "will assist the trier of fact to understand the evidence or to determine a fact in issue."  *Daubert v. Merrell Dow Pharms., Inc.* ("*Daubert I*"), 509 U.S. 579, 589 (1993) (citing Fed. R. Evid. 702(a)).  "The relevancy bar [for expert testimony] is low, demanding only that the evidence 'logically advances a material aspect of the proposing party's case.'"  *Messick v. Novartis Pharms. Corp.*, 747 F.3d 1193, 1196 (9th Cir. 2014) (quoting *Daubert v. Merrell Dow Pharm., Inc.* ("*Daubert II*"), 43 F.3d 1311, 1315 (9th Cir. 1995)).  "Shaky but admissible evidence is to be attacked by cross examination, contrary evidence, and attention to the burden of proof, not exclusion."  *Primiano v. Cook*, 598 F.3d 558, 564 (9th Cir. 2010).

Courts apply four factors in determining whether expert testimony is reliable.  These include "1) whether a theory or technique can be tested; 2) whether it has been subjected to peer review and publication; 3) the known or potential error rate of the theory or technique; and 4)

whether the theory or technique enjoys general acceptance within the relevant scientific community." *United States v. Hankey*, 203 F.3d 1160, 1167 (9th Cir. 2000) (citing *Daubert I*, 509 U.S. at 592–94). But this list of factors is neither exhaustive nor intended to be applied in every case. *Id.* (citing *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 150 (1999)). A court "not only has broad latitude in determining whether an expert's testimony is reliable, but also in deciding how to determine the testimony's reliability." *Hangarter v. Provident Life & Accident Ins. Co.*, 373 F.3d 998, 1017 (9th Cir. 2004) (internal quotations omitted). And "[w]hile evidence that suffer[s] from serious methodological flaws . . . can be excluded, courts are not permitted to determine the veracity of the expert's conclusions at the admissibility stage." *Teradata Corp. v. SAP SE*, 124 F.4th 555, 566 (9th Cir. 2024) (internal quotations and citations omitted) (second alteration in original).

The proponent of the expert testimony bears the burden of establishing admissibility by a preponderance of the evidence. *See Lust v. Merrell Dow Pharm., Inc.*, 89 F.3d 594, 598 (9th Cir. 1996); *see also Qualey v. Pierce Cnty.*, No. 3:23-CV-05679-TMC, 2025 WL 254810, at *3 (W.D. Wash. Jan. 21, 2025). And courts liberally construe Rule 702 in favor of admissibility. *See Daubert I*, 509 U.S. at 588; *see also Chinn v. Whidbey Pub. Hosp. Dist.*, No. C20-995 TSZ, 2021 WL 5200171 (W.D. Wash. Nov. 9, 2021).

B.     General Acceptance of Economic Model

Amazon contends that Dr. Pathak's methodology, derived from a 2016 paper by Andre Boik and Kenneth S. Corts, is unreliable because the model used is not widely accepted in the field of economics. Dkt. # 230 at 8.[4] The company asserts that there are no standards for

---

[4] *See* Andre Boik & Kenneth S. Corts, *The Effects of Platform Most-Favored-Nation Clauses on Competition and Entry*, 59 J.L. & Econ. 105 (2016). *See also* Dkt. # 231 at 4–34. This Order refers to the economic model outlined in this paper as the Boik-Corts model.

~~SEALED~~ ORDER DENYING MOTION TO
EXCLUDE EXPERT TESTIMONY - 6

applying the model beyond simplified assumptions and it does not reflect a generally accepted consensus in the field of economics. *Id.* It also says that Dr. Pathak has not offered a scientifically valid basis for projecting the findings of the model to this case, and his opinions should thus be excluded. *Id.* at 9 (internal citations omitted).

Plaintiffs respond that Dr. Pathak's impact and damages methodology derives from the Boik-Corts model, which methodology shows that PMFNs restrain competition from rival platforms and ultimately raise platform fees and retail prices. Dkt. ## 182-6; 308 at 7. They say that Amazon's own expert, Dr. Lorin Hitt, undermines the company's argument that the Boik-Corts model is not widely accepted. Dkt. # 308 at 7. They note that Dr. Hitt testified that he reviewed 82 papers and did not know of any that criticized the Boiks-Corts model or suggested that the model contained errors. *Id.* (citation omitted). As to Amazon's argument that the model lacks an "established error rate," Plaintiffs respond that the Boiks-Corts model is a mathematical model (as opposed to a regression model with a statistical error rate) and that any errors would derive from the model itself. *Id.* at 9. They underscore that the Boiks-Corts model has been subject to peer-review and no economists have identified errors therein. *Id.*

In forming his opinion, Dr. Pathak examined the "competition softening and fee-inflating effects of prohibiting merchants from setting lower off-platform prices than prices on Amazon." Dkt. # 262 a 113 ¶ 284. In his rebuttal report, Dr. Pathak mentions that he selected the Boik-Corts model, as opposed to another economic model, because "it is a robust and widely-used model that aligns closely with the real-world setting in which the conduct [at issue] took place." Dkt. # 307-1 at 15 ¶ 22. He explains that the model "starts from certain economic axioms (assumptions) and derives results, such as PMFNs have an inflationary effect on prices." *Id.* at 15 ¶ 23. Dr. Hitt testified that the 2016 Boik-Corts paper is "one of the papers that you would normally cite if you [were] studying a platform MFN." *Id.* at 31 (citing Hitt Tr. 243:13–18).

Furthermore, in response to the argument that the model is a "simplified representation of reality," Dr. Pathak points out that "[m]odelling assumptions are, by definition, simplified representations of reality and therefore clearly imperfect in the literal sense." *Id.* at 16 ¶ 25. He stresses that such a critique "does not address whether the model is reliable or useful." *Id.* Moreover, in response to Dr. Hitt's contention that there is "no generally accepted consensus that PMFNs necessarily result in higher prices," Dr. Pathak says that the third-party research papers that Dr. Hitt relies on to support this argument are either support Dr. Pathak's finding or are "statistically inconclusive." *Id.* at 15–16 ¶ 24. And he says that "all three of the theoretical papers that Dr. Hitt highlights model situations that are very different from the challenged conduct." *Id.*

The reliability inquiry focuses on "whether the reasoning or methodology underlying the testimony is scientifically valid." *Daubert I*, 509 U.S. at 592–93. As describe above, several factors may bear on the reliability analysis including, "whether the theory or technique enjoys general acceptance within the relevant scientific community." *Hankey*, 203 F.3d at 1167 (citing *Daubert I*, 509 U.S. at 592–94). But as discussed above, "the *Daubert* factors are exemplary, not constraining." *Murray v. S. Route Mar. SA*, 870 F.3d 915, 922 (9th Cir. 2017) (citing *Kumho Tire Co.*, 526 U.S. at 150, 159) (Scalia, J., concurring) ("[T]he *Daubert* factors are not holy writ[.]").

Dr. Pathak's application of the Boik-Corts model to Amazon's transactional data does not render his expert opinion unreliable. The Boik-Corts paper was first published in a peer-reviewed journal in 2016 and, in the words of Amazon's expert, has become "one of the papers that you would normally cite if you [were] studying a platform MFN." Dkt. # 307-1 at 15 (citations omitted). And Amazon does not point the Court to any economic literature describing flaws or errors in the model. *See* Dkt. # 308; *see also* Dkt. # 307-1 at 15 n.29 (During his

deposition, Dr. Hitt stated that he looked at 82 research papers focused on PMFNs and could not recall any of these papers critiquing the Boik-Corts model).

And Amazon's contention that Dr. Pathak improperly extended the Boik-Corts model to the facts of this case is unavailing. Dr. Pathak says that he applied the Boik-Corts model to transactional data provided by Amazon to assess the impact of the company's anti-discounting policies. Dkt. # 262 at 24 ¶ 42. He analyzed about 236 million individual items sold on Amazon from May 2017 to July 2023 across 30 different categories. *Id.* And he explains that although the Boik-Corts model assumes that a merchant is a "monopoly seller" and controls prices across all platforms, he extended the model to consider other economic conditions, including a variant that included "perfectly competitive" assumptions—i.e., the seller faces so much competition for its products that prices are driven down to costs. *Id.* at 126 ¶ 316; *see also* App'x at 276–79 ¶¶ 196–217. Dr. Pathak states that his conclusion was the same regardless of the competitive conditions imposed on the model—anti-discounting policies result in higher prices. Dkt. # 262 at 126 ¶ 316. In sum, Dr. Pathak took a peer-reviewed economic model and applied that model to transactional data provided by Amazon.[5]

As other courts have noted, "[d]isputes about the . . . faults in an expert's decision to use a particular methodology . . . or the lack of textual authority for an expert's opinion go to the weight, not the admissibility, of his testimony." *Clarke v. LR Sys.*, 219 F. Supp. 2d 323, 333

---

[5] Other courts in this Circuit, including one in this District, have found non-statistical modeling sufficiently reliable. *See In re Valve Antitrust Litig.*, No. 2:21-CV-00563-JNW, 2024 WL 4893373, at *4–5 (W.D. Wash. Nov. 26, 2024) (rejecting the defendant's reliability challenges to the expert's use of non-statistical modeling); *In re Coll. Athlete NIL Litig.*, No. 20-CV-03919-CW, 2023 WL 8372788, at *3 (N.D. Cal. Nov. 3, 2023) (permitting the expert's non-statistical modeling given his explanation of his experience and review of relevant data) (citing *Optronic Techs., Inc. v. Ningbo Sunny Elec. Co.*, No. 5:16-CV-06370-EJD, 2019 WL 4780183, at *3 (N.D. Cal. Sept. 30, 2019), *aff'd*, 20 F.4th 466 (9th Cir. 2021) (rejecting the argument that an expert's opinions that were "not subject to peer review or exact replication" were "unsupported" and determining that the opinions were sufficiently reliable because they were based on the expert's experience and the expert "provide[d] a sufficient basis for understanding how he reached his opinions and to show that they are supported").

(E.D.N.Y. 2002) (quoting *McCullock v. H.B. Fuller Co.*, 61 F.3d 1038, 1044 (2d Cir. 1995)).

And "[w]hile one of the *Daubert* factors suggests that the reliability of expert testimony can be

judged by whether that expert's technique or theory can be and has been empirically tested . . .

such testing is not required." *Linares v. Crown Equip. Corp.*, No. EDCV 16-1637 JGB (KKx),

2017 WL 10403454, at *12 (C.D. Cal. Sept. 13, 2017) (internal citation omitted); *Brown v.

Google, LLC*, No. 20-CV-3664-YGR, 2022 WL 17961497, at *13 (N.D. Cal. Dec. 12, 2022)

(same). At this gatekeeping stage of the litigation, it would be improper for the Court to

"evaluate the quality of an expert's data, inputs, or conclusions." *In re Dealer Mgmt. Sys.

Antitrust Litig.*, 581 F. Supp. 3d 1029, 1054 (N.D. Ill. 2022) (quoting *In re Zimmer Nexgen Knee

Implant Products Liability Litig.*, No. 11 C 5468, 2015 WL 3669933, at *25 (N.D. Ill. June 12,

2015)).

   And the cases Amazon relies on are distinguishable. For example, in *United States v.

Cordoba*, 194 F.3d 1053, 1060–61 (9th Cir. 1999), in reviewing the district court's decision to

exclude polygraph evidence under Rule 702, the Ninth Circuit determined that the district court

did not abuse it discretion in determining that the "relevant scientific community did not

generally accept polygraph exams as being sufficiently reliable to be used as evidence in a trial."

*Id.* at 1061. In that case, the court noted that the district court relied on evidence, including a

scholarly treatise and testimony from an FBI agent, calling into question the validity and

scientific soundness of polygraph exams. *Id.* Here, there is no such scholarship or testimony.

   And the reliability issue in *Great American Alliance Insurance Co. v. Sir Columbia Knoll

Associates Limited Partnership*, 484 F. Supp. 3d 946, 956 (D. Or. 2020), involved a wood

scientist providing expert testimony about the rate of wood decay in an apartment building

following water damage. *Id.* The court noted that Columbia Knoll conceded that its expert

witness's application of the model at issue "ha[d] not been tested for proof of accuracy and there

~~SEALED~~ ORDER DENYING MOTION TO
EXCLUDE EXPERT TESTIMONY - 10

is no known or potential error rate." *Id.* at 956. In excluding the expert's opinion as unreliable, the court focused on the fact that the expert applied a forward-looking prediction model to retroactively determine when the wood decay occurred. *Id.* As the court observed, Columbia Knoll failed to respond to the insurers' argument that it was not a generally accepted scientific practice to apply the prediction model retroactively. *Id.* The court also noted that Columbia Knoll did not "cite any external support for the reliability of [the expert's] application." *Id.*

Last, *Otto v. Refacciones Neumaticas La Paz, S.A., DE C.V.*, No. :16-cv-00451-MMD-WGC, 2020 WL 907560, at *4 (D. Nev. Feb. 25, 2020), involved a *Daubert* motion to exclude an expert's proposed safer, alternative jackleg drill design. *Id.* There, the plaintiff brought a strict liability claim against the defendant alleging that a design defect in a jackleg drill caused her husband's death. *Id.* at *1. The court, in determining that the expert's opinion on a safer, alternative jackleg drill design was unreliable, noted that the expert's proposed design had never been peer-reviewed or tested and lacked general acceptance within the relevant mining community. *Id.* at *4.

Unlike the opinions in the cases discussed above, Dr. Pathak's opinion derives from an application of a well-known, peer-reviewed economic model.

C.    Error Rate

Amazon contends that Dr. Hitt performed validation tests that demonstrate that Dr. Pathak's model "gets it wrong more often than not" with error rates ranging from 60% to 100%. Dkt. # 230 at 9. The company asserts that Dr. Pathak's model has a 100% false positive rate because it always concludes that a PMFN is inflating all fees and prices even when analyzing data when no PMFN was in effect. *Id.* at 11. It also asserts that Dr. Hitt compared the model's predictions to real world data following Amazon's removal of its Price Parity Policy (PPP) in the United Kingdom and Germany. *Id.* Amazon says that real-world data shows that consumer

prices did not decrease for nearly ▮% of products following the removal.  According to Amazon, Dr. Pathak's model predicted the prices for 100% of the products would decrease.  *Id.* at 12.  Lastly, the company asserts that Dr. Pathak's model predicts "incorrect and nonsensical marginal costs."  *Id.*

Plaintiffs respond that Amazon's assertion that the model has a 100% false positive rate is misleading.  Dkt. # 308 at 10.  They explain that contrary to Amazon's assertion that the model predicts 100% of the time that a PMFN is responsible for inflated fees and prices, the model is not designed to detect the existence of a PMFN.  *Id.*  Instead, the model demonstrates how a PMFN increases platform and retail fees and measures whether prices would have been lower absent the PMFN.  *Id.*  As to Amazon's argument about the model's failure to detect real-world changes, Plaintiffs counter that Amazon did not remove the PPP until late August 2013 in Germany and late November 2013 in the United Kingdom, and Dr. Hitt compared prices in September 2013.  *Id.* at 11.  Plaintiffs say that Dr. Hitt's price comparison is "senseless" because the removal of the PPP in the United Kingdom had not yet occurred, and German sellers had only days or weeks to respond to the changes.  *Id.*[6]  In response to Amazon's argument about marginal costs, Plaintiffs say that because marginal costs were not directly observed in the available data, Dr. Pathak used an "inverse optimization to approximate marginal costs."  *Id.* at 11–12.  Plaintiffs say that, at most, Amazon's argument presents an argument that goes to the weight of Dr. Pathak's testimony, not its admissibility.  *Id.*

---

[6] Plaintiffs also assert that there is reason to doubt that the German and United Kingdom marketplaces were at any time free from anti-discounting policies.  In his rebuttal report, Dr. Pathak notes that months before removing the PPP in the United Kingdom and Germany, Amazon introduced Manufacturers on Amazon, an anti-discounting policy for brand sellers and a precursor to Amazon's Standard for Brands. Dkt. # 307-1 at 84.

In his rebuttal report, Dr. Pathak explains that the Boiks-Corts model "is not a test of whether a PMFN exists, and it does not return 'positive' or 'negative' results." Dkt. # 307-1 at 16 ¶ 26. He also states that, contrary to Dr. Hitt's assertion, the model does not "assume its conclusion." *Id.* at 73 ¶ 204. Dr. Pathak explains,

> Dr. Hitt mischaracterizes the Boik and Corts model and criticizes the very concept of mathematical reasoning from stated premises, even though he acknowledges that a model "that was proven based on fundamental math axioms" does not "assume its conclusion." The conclusions of the Boik and Corts model are not "assumed" -- they follow logically from principles and interactions set out at the outset.

*Id.* Dr. Pathak states that he reviewed the record, and the facts support his conclusion that Amazon's anti-discounting policies constitute a class-wide PMFN. Dkt. #307-1 at 19 ¶ 37. In his report, Dr. Pathak explains the facts that lead him to reach this conclusion. Dkt. # 262 at 16–22 ¶¶ 20–35. And in response to Dr. Hitt's argument that he did not perform calibration tests, Dr. Pathak explains that he compared "Amazon's US fees against those in other more competitive international markets." Dkt. # 307-1 at 17 ¶ 27.

That Dr. Pathak's model assumes the existence of a PMFN does not automatically render it unreliable. As noted above, Dr. Pathak reviewed the facts and explained his basis for concluding that Amazon's anti-discounting policies act as a PMFN. Thus, Amazon's argument does not show that the economic model Dr. Pathak used is unreliable. *See, e.g.*, *City of Pomona v. SQM N. Am. Corp.*, 750 F.3d 1036, 1048 (9th Cir. 2014) ("[O]nly a faulty methodology or theory, as opposed to imperfect execution of laboratory techniques, is a valid basis to exclude expert testimony."). And Amazon can cross examine Dr. Pathak and present contrary evidence regarding the factual basis for his opinion. *See Hangarter*, 373 F.3d at 1017 n.14.

As to Amazon's arguments about real-world data and marginal costs, the Court is not persuaded that this contest between economic experts is best resolved here. Dr. Pathak states in his report that he compared the predicted United States fee outcomes to fee outcomes in

SEALED ORDER DENYING MOTION TO
EXCLUDE EXPERT TESTIMONY - 13

countries in which Amazon has less market power and lower referral fees. Dkt. # 262 at 146–150 ¶¶ 388–401. He says in some of these other countries in which Amazon lacks the market power it currently possesses in the United States, the company appears to have charged lower referral fees. *Id.* He also describes the empirical evidence he relied on to reach his conclusion. *Id.* As to marginal costs, Dr. Pathak states that the marginal costs he used in his model "reflect the incremental costs that firms in the real world considered when setting prices and output, but it does not specify what categories of costs firms considered." Dkt. # 307-1 at 88 ¶ 252. To the extent that Amazon disagrees with the way Dr. Pathak approximates marginal costs in his model, this disagreement is more appropriately addressed at trial. *See Emblaze Ltd. v. Apple Inc.*, 52 F. Supp. 3d 949, 954 (N.D. Cal. 2014) ("The inquiry into admissibility of expert opinion is a 'flexible one,' where shaky 'but admissible evidence is to be attacked by cross examination, contrary evidence, and attention to the burden of proof, not exclusion.'") (quoting *Primiano*, 598 F.3d at 564); *see also In re MyFord Touch Consumer Litig.*, 291 F. Supp. 3d 936, 969 (N.D. Cal. 2018) ("Though Ford criticizes Mr. Boedeker's decision not to analyze used car sales data, that objection goes to the weight of his opinion, not its admissibility.").

The *Daubert* inquiry is flexible, and the listed factors do not apply equally to every type of expert testimony. Here, Dr. Pathak's conclusions are capable of being tested. And his opinions "are supported by rational explanations which [a] reasonable [person] might accept, and none of his methods strike the court as novel or extreme." *Lappe v. Am. Honda Motor Co., Inc.*, 857 F. Supp. 222, 228 (N.D.N.Y. 1994). Thus, Amazon raises issues that go to the weight a factfinder should afford Dr. Pathak's expert opinion, not its admissibility.

D.   The Model's Underlying Assumptions

Dr. Pathak's opinion assumes the existence of a PMFN. Dkt. # 262 at 15 ¶ 10. Amazon asserts that Dr. Pathak "assumes without justification" that Amazon's policies and practices

constitute a PMFN.  Dkt. # 230 at 13.  According to Amazon, there "is too great an analytical gap between the data and the opinion preferred."  *Id.* at 12 (quoting *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997)).  The company also says that Dr. Pathak's opinion of class-wide injury and damages contains too many assumptions and is not supported by real-world evidence.  *Id.* at 15.  The company explains that Dr. Hitt introduced three modifications to Dr. Pathak's model to reflect commercial realities and the class-wide injury and damages disappeared.  *Id.*

Plaintiffs counter that Dr. Pathak's report describes the facts that support his opinion that Amazon's anti-discounting policies act as a PMFN.  Dkt. # 308 at 12.  As for Amazon's argument that Dr. Pathak's model does not reflect market realities, Plaintiffs point out that economic models necessarily simplify market complexities, and Dr. Pathak has explained why simplifying these assumptions does not undermine the model's conclusions.  *Id.* at 13.  And Plaintiffs say that Dr. Pathak has provided reasons to reject Dr. Hitt's modifications to the model.  *Id.* at 14.

In his report, Dr. Pathak evaluates (1) the Price Parity Clause, (2) the Select Competitor Featured Offer Disqualification program, (3) the Marketplace Fair Pricing Provision, (4) Amazon's Standard for Brands, and (5) the Seller Code of Conduct.  Dkt. # 262 at 68–95 ¶¶ 159–241.  He discusses these policies, describes how Amazon enforces these policies, and assesses their impact on merchant and consumer conduct.  *Id.*

Rule 702(b) requires that expert testimony be based on "sufficient facts or data"; the rule "is not intended to authorize a trial court to exclude an expert's testimony on the ground that the court believes one version of the facts and not the other."  *Bosley v. DePuy Synthes Sales Inc.*, No. C21-1683-MLP, 2023 WL 6038010, at *4 (W.D. Wash. Sept. 15, 2023).  Amazon may disagree with the conclusions Dr. Pathak arrived at based on his review of the record, but such a disagreement does not render Dr. Pathak's opinion unreliable.  *See In re Valve Antitrust Litig.*,

2024 WL 4893373, at *4 ("Valve may disagree with the conclusions Dr. Schwartz's derived from this information and it may even offer countervailing evidence, but Valve cannot render Dr. Schwartz's opinion unsound under Rule 702 simply by advancing a contrary position.").

And Amazon's contention that Dr. Pathak's model is unreliable because the underlying assumptions do not reflect reality is unpersuasive.  To be sure, economic "models must be tethered to theories of liability, fit the case, have a reliable basis, and avoid guesswork. But they will, as any economic model inevitably will, simplify the world." *Maldonado v. Apple, Inc*, No. 3:16-CV-04067-WHO, 2021 WL 1947512, at *22 (N.D. Cal. May 14, 2021) (citing *Story Parchment Co. v. Paterson Parchment Paper Co.*, 282 U.S. 555, 563 (1931)).  As other courts have noted "every model relies on assumptions and no model can account for every conceivably relevant factor." *In re Folgers Coffee, Mktg. Litig.*, No. 21-00828-CV-W-BP, 2024 WL 4068851, at *5 (W.D. Mo. July 31, 2024) (quoting *S&H Farm Supply, Inc. v. Bad Boy, Inc.*, 25 F.4th 541, 552 (8th Cir. 2022) (analyzing an expert's model on lost wages and noting that the defendant "was free to challenge—in fact, did challenge—[the plaintiff's] assumptions during cross-examination")).  Amazon's critiques of the model's assumptions go to the weight that should be afforded to Dr. Pathak's opinion, not its admissibility.

Furthermore, Dr. Pathak reasonably explains why Dr. Hitt's adjustments to the model do not affect his conclusions regarding class-wide injury and damages.  In his rebuttal report, Dr. Pathak examines each of Dr. Hitt's critiques and says that

> these arguments miss [his] model's purpose: to examine how a PMFN affects competition between marketplaces. When a dominant marketplace prevents merchants from offering discounts on other marketplaces, merchants have two rational responses. First, they might set identical prices across all platforms. Second, as . . . discussed in [his] opening report, they might abandon multi-homing entirely and sell exclusively through the dominant platform, even if they would have used multiple platforms without the anti-discounting policy. Both imperfect enforcement and merchants' decisions to use only one platform are consistent with

1    [his] central thesis: the PMFN affected merchant incentives, which in turn distorted
2    marketplace competition.

Dkt. # 307-2 at 61 ¶ 169.  Amazon asserts that Dr. Pathak's analysis is unreliable, but it has not

shown how, considering Dr. Pathak's explanations, this disagreement between Dr. Hitt and Dr.

Pathak should lead to the exclusion of the latter's testimony.  *See In re Vitamin C Antitrust Litig.*,

No. 05-CV-0453, 2012 WL 6675117, at \*5 (E.D.N.Y. Dec. 21, 2012); *see also Deutsch v.*

*Novartis Pharms. Corp.*, 768 F. Supp. 2d 420, 456 (E.D.N.Y. 2011) (determining that the expert

"satisfied his burden under *Daubert* by identifying the alternative causes and providing a

reasonable explanation for dismissing specific alternate factors identified by Novartis. . .

Novartis' contention that [the expert] should have controlled for these factors goes to the weight

that ought to be afforded to [the expert's] findings, not the reliability of his methodology")

(cleaned up).

Amazon appears to ask the Court to take a side in a dispute between experts about

complex economic modeling.  This is not the proper function of a *Daubert* motion.  This is not a

case in which an expert cannot articulate a rationale for his methodology; nor is it a case where

the expert's rationale is obviously flawed or unreasonable.  As demonstrated above, Dr. Pathak

has provided explanations for his methodological decisions that are grounded in economic

literature.  *See In re Elec. Books Antitrust Litig.*, No. 11 MD 2293 DLC, 2014 WL 1282293, at

\*25 (S.D.N.Y. Mar. 28, 2014) ("A minor flaw in an expert's reasoning or a slight modification of

an otherwise reliable method does not itself require exclusion; exclusion is only warranted if the

flaw is large enough that the expert lacks good grounds for his or her conclusions.") (internal

quotation and citation omitted); *In re Vitamin C Antitrust Litig.*, 2012 WL 6675117, at \*4 (in

rejecting the plaintiff's *Daubert* challenge to the defendant's economics expert, the court noted

that the expert's "analysis [and] the explanations that he offers appear reasonable and supported by both economic theory and historical facts").

And Amazon has not shown that Dr. Pathak's choices are unsound or so flawed as to make his opinion unreliable. *See In re Valve Antitrust Litig.*, 2024 WL 4893373, at *5 ("Valve, in making its analytical gap argument, takes an overly exacting view of Rule 702's requirements. Dr. Schwartz provides common evidence of the varied ways in which Valve establishes its PMFN expectation. Whether that evidence and Dr. Schwartz's conclusions deserve credence is an inquiry for a different day.").

E.    Heterogeneity in Sellers' Business Practices

Amazon contends that Dr. Pathak's model ignores that "sellers price their products using different strategies and face different economic constraints." Dkt. # 230 at 15. The company says that Dr. Pathak's methodology does not account for "focal point" pricing—i.e., a practice in which sellers commonly set prices ending with certain values such as $0.99. *Id.* Amazon explains that Dr. Pathak's model predicts that consumer prices for about 20% of class products change by less than 15 cents. *Id.* at 16. Thus, according to Amazon, if a seller prefers to set prices ending in 99 cents or $9.99, they will likely not increase their prices based on a small increase in fees. *Id.*

Plaintiffs counter that Dr. Pathak accounts for focal point pricing in his analysis. Dkt. # 308 at 14. They say that Dr. Pathak explains in his report why the chance of any class member being uninjured due to focal point pricing is trivial, given that most of the products are not focal point priced and most consumers bought multiple products on Amazon. *Id.*

Focal point pricing occurs when retailers set prices at "focal points," such as prices ending in 99 cents or a round number. *See* Dkt. # 262 at 145 ¶ 383; *see also Sidibe v. Sutter Health*, 333 F.R.D. 463, 495 (N.D. Cal. 2019) (describing focal point pricing as "the practice of

retailers setting prices at certain 'focal points,' such as prices ending with 9, and not adjusting

such prices based on small differences in costs"). In his report, Dr. Pathak explains,

> Given an assumption of focal-point bias, it might be possible to identify particular
> incidents in which a sale could be plausibly argued to have had the same price in
> the but-for world as it did in the real world, despite the lower referral fee in the
> latter. But this possibility does not affect [his] conclusion that all or virtually all
> class members [were] harmed by the conduct because virtually all class members
> made enough purchases to have overpaid on at least some of them.

Dkt. # 262 at 145–46 ¶ 387. In his rebuttal report, Dr. Pathak makes clear that

> The possibility of focal point pricing behavior does not affect [his] conclusion that
> all or virtually all class members were harmed by the conduct. This is because
> virtually all class members made enough purchases to have overpaid on at least one
> of them, even if they were not harmed on purchases of focally-priced items of
> merchandise. For example, under the conservative assumption that all items ending
> in 99 cents in the real world would have also been priced at the same 99-cent
> increment in the counterfactual world, less than 1% of class members under the
> modified class definition would have escaped injury.

Dkt. # 307-1 at 93 ¶ 266. Thus, Dr. Pathak accounts for focal point pricing and reasonably

explains why focal point pricing does not impact his determinations.

And the cases Amazon relies on are distinguishable. For example, in *In re Apple iPhone*

*Antitrust Litigation*, No. 11-CV-6714-YGR, 2022 WL 1284104, at *8 (N.D. Cal. Mar. 29, 2022),

the court, in excluding the expert's opinion, observed that the expert's "pricing model ignore[d]

Apple's focal-point pricing and pricing tiers in calibrating but-for pricing." *Id.* at *8. As the

court noted, the expert "failed to use or address the issue" and "the model d[id] not provide a

reliable method for determining but-for pricing in the presence of focal pricing." *Id.* And in *In*

*re Lithium Ion Batteries Antitrust Litigation*, No. 13-MD-2420 YGR, 2018 WL 1156797, at *1

(N.D. Cal. Mar. 5, 2018), the court noted that the expert acknowledged that his analysis could be

impacted by focal point pricing strategies "but his analysis did not explain how they would affect

his analysis of pass-through or his calculation of damages." *Id.* As stated above, Dr. Pathak

addresses focal point pricing.

F.      Reliability of Dr. Pathak's Regressions Analyses

Dr. Pathak also studies how Amazon's fees affect merchandise prices by analyzing price changes following Amazon's partial fee reduction in 2019 for four product categories: Baby, Health & Personal Care, Beauty, and Furniture. Dkt. # 307-1 at 99 ¶ 284. Dr. Pathak states that the results from his analyses confirmed the model's predictions: lower fees lead to lower prices. *Id.*

Amazon contends that Dr. Pathak's regression analyses are unreliable because they rely on a small, unrepresentative data sample. Dkt. # 230 at 16. The company says that Dr. Pathak analyzed only a small percentage of products affected by the fee reductions, amounting to only 0.0001% of the class products. *Id.* It also argues that Dr. Pathak's regressions do not show a relationship between fees and prices. *Id.* at 17. Amazon says that the regression is unreliable because it assumes that all 2.5 million third-party sellers on Amazon act uniformly in adjusting prices for all products subject to a fee change. *Id.*

Plaintiffs respond that a difference-in-difference regression analysis is a widely accepted econometric tool that courts routinely allow in antitrust cases. Dkt. # 308 at 16 (citations omitted). And as to Amazon's argument that the size of the data sample is too small, Plaintiffs say that Dr. Pathak analyzed all the data available across the four product categories. *Id.* They also assert that Amazon's argument about sample size goes to the weight rather than the admissibility of Dr. Pathak's testimony. *Id.* Plaintiffs also state that Dr. Pathak's regression analyses do not assume that all sellers decrease prices when fees decease; instead, they say, the tests confirm this prediction across different product categories. *Id.* at 17.

Dr. Pathak used a difference-in-difference econometric model to compare the prices of individual goods sold on Amazon to other online marketplaces like Walmart. Dkt. # 262 at 148 ¶ 396. He says that his analysis "supplements and supports the findings of the economic model."

*Id.* at 148 ¶ 394.  In 2019, Amazon lowered its fees in four categories of products: Baby, Health & Personal Care, Beauty, and Furniture.  *Id.* at 148 ¶ 395.  Dr. Pathak says that this change applied to a subset of goods within these categories.  *Id.*  He explains that he analyzed these fee changes, separately and collectively, to empirically assess whether the change in fees had an impact on product pricing.  *Id.*  Using transactional data provided by Amazon, he divided products into a treatment group (products in categories that experienced a fee change) and a control group (products in categories that did not experience a fee change).  *Id.* at 148 ¶ 396.  Dr. Pathak states that his analysis compares the movements of prices in the treatment group to prices in the control group to isolate the impact of the treatment.  *Id.*

In his rebuttal report, Dr. Pathak emphasizes that he did not "cherry-pick subsets of the data." Dkt. # 307-1 at 99 ¶ 285.  He says that he "analyzed all available prices in every category where a fee reduction occurred."  *Id.*  Dr. Pathak says that Dr. Hitt's observation that the regression model accounts for "0.001 percent of the nearly 240 million unique ASINs sold by 3P sellers on the Amazon Marketplace" is misleading because

> [t]he millions of items that Dr. Hitt highlights in these comparisons are not included in [Dr. Pathak's] analysis for a simple reason: they did not experience any fee reduction. They are therefore uninformative about whether drops in fees were passed through to prices. [Dr. Pathak] . . .used all of the available data, between 109,056 and 166,656 observations, for which a fee reduction occurred. This dataset has been sufficient to establish, with high statistical confidence, that the predicted relationship between fee reduction and price decreases does exist.

Dkt. # 307-1 at 114 ¶ 332.

As one court stated in ruling on a *Daubert* motion to exclude, so long "as a sample is representative—that is, it was not selected in a biased manner—sample size will not skew the results of the analysis." *U.S. Info. Sys., Inc. v. Int'l Bhd. of Elec. Workers Loc. Union No. 3, AFL-CIO*, 313 F. Supp. 2d 213, 232 (S.D.N.Y. 2004); *see also In re Countrywide Financial Corp. Mortgage-Backed Securities Litig.*, 984 F. Supp. 2d 1021, 1034 (C.D. Cal. 2013) ("[A]

100 item sample size comprises sufficient data for a sample of a large population"); *Counts v. Gen. Motors, LLC*, 606 F. Supp. 3d 547, 572 (E.D. Mich. 2022) ("[I]ssues with sample size go to the weight, not the admissibility, of expert evidence."); *Shupe v. Rocket Cos., Inc.*, 752 F. Supp. 3d 689, 722 (E.D. Mich. 2024) (same). Sample size "will have an effect on whether the results are significant, i.e., whether the analyst can be confident that a perceived difference is due to the factor being studied rather than to chance." *U.S. Info. Sys., Inc.*, 313 F. Supp. 2d at 232.

Moreover, whether the results are statistically significant is testable. Dr. Pathak notes that he tested for statistical significance using measures such as the t-statistic. *See* Dkt. # 307-1 (App'x A) at 138 ¶ 8.[7] There is nothing to suggest that Dr. Pathak selected the data in a biased manner; instead, he appears to have analyzed all the data available to him. And Dr. Pathak performed these regression analyses on available empirical data to corroborate the conclusion of his economic modeling. *See Teradata Corp.*,124 F.4th at 568 (in determining that a district court abused its discretion in excluding an expert witness's qualitative analyses, the Ninth Circuit noted that "those analyses were merely confirmatory, any flaws they might have would not be a sufficient basis to exclude his tying-market testimony"); *Obrey v. Johnson*, 400 F.3d 691, 695 (9th Cir. 2005) ("[O]bjections to a study's completeness generally go to the weight, not the admissibility of the statistical evidence and should be addressed by rebuttal, not exclusion.") (cleaned up).

And as to Amazon's second argument, Dr. Pathak explains that his regression model does not assume that all sellers decrease prices when fees decrease. Dkt. # 307-1 at 101–02 ¶ 293. He says that the

---

[7] Dr. Pathak notes that "[r]esearchers use t-tests to determine whether a sample meaningfully differs from a larger group, given the distribution of values in that group." Dkt. # 307-1 (App'x A) at 138 ¶ 8.

empirical model must analyze many items of merchandise together to isolate a price effect precisely because of the variation that Dr. Hitt mentions. Each individual item of merchandise is affected by idiosyncratic pricing effects unrelated to the conduct, in addition to the effect of the fee change itself. [His] model acknowledges that prices are driven by many factors unconnected to fee changes.

Dkt. # 307-1 at 102 ¶ 296. Dr. Pathak also addresses each of Dr. Hitt's critiques of his regression analyses and explains why these criticisms do not impact his findings. Dkt. # 307-1 at 99–117 ¶¶ 284–342. And Amazon has not shown that Dr. Pathak's methodological decisions are so flawed as to make his opinion unreliable. *See In re Digital Music Antitrust Litig.*, 321 F.R.D. 64, 75 (S.D.N.Y. 2017) ("As long as an expert's scientific testimony rests upon 'good grounds, based on what is known,' it should be tested by the adversary process—competing expert testimony and active cross-examination—rather than excluded from jurors' scrutiny for fear that they will not grasp its complexities or satisfactorily weigh its inadequacies.") (quoting *Ruiz– Troche v. Pepsi Cola of Puerto Rico Bottling Co.*, 161 F.3d 77, 85 (1st Cir. 1998)).

And the cases Amazon relies on are distinguishable. For example, in *In re Graphics Processing Units Antitrust Litigation*, 253 F.R.D. 478, 494 (N.D. Cal. 2008), an expert's correlation and regression models used the average prices paid by consumers. *Id.* at 493–95. As the court noted, the expert's report did not say how "specific product pricing was correlated across buyers or whether prices paid for multiple products by particular direct purchasers were correlated." *Id.* at 493. It further reasoned that "[i]f data points are lumped together and averaged before the analysis, the averaging compromises the ability to tease meaningful relationships out of the data." *Id.* And in *In re Pharmacy Benefit Managers Antitrust Litigation*, No. CV 03-4730, 2017 WL 275398, at *20 (E.D. Pa. Jan. 18, 2017), the court rejected an expert's use of national averages in his regression model because "averages cannot demonstrate antitrust impact for individual class members." *Id.* The court noted that the regression model was unreliable because by analyzing only average prices the model found damages for class

members who have suffered no damage. *Id.* Unlike in these cases, Dr. Pathak's inputs include available prices in the categories in which fee reduction occurred. Dkt. # 307-1 at 99 ¶ 285. And he analyzes prices across and within the various product categories. Dkt. # 262 at 148–49 ¶ 396 (stating that his analysis "compares the movements of prices in the treatment group to prices in the control group, in order to isolate the impact of the treatment"); *see also* Dkt. # 307-1 at 101–03 ¶¶ 293–97.

Thus, again, Amazon's concerns thus go to the weight that should be afforded to Dr. Pathak's opinion, not its admissibility. Dr. Pathak's methodology can be tested through the adversary process—competing expert testimony, other contrary evidence, and the "crucible of cross-examination." *See Encompass Ins. Co. v. Norcold, Inc.*, No. 2:23-CV-231, 2025 WL 36025, at *3 (W.D. Wash. Jan. 6, 2025) (reasoning that any alleged shakiness in the expert witness's opinion "should be addressed through the crucible of cross-examination and the adversarial process").

## IV

### CONCLUSION

Based on the above, the Court DENIES Amazon's motion to exclude testimony of Dr. Parag Pathak, Ph.D. ~~The Court provisionally files this Order under seal. The Court DIRECTS the parties to file a joint statement, on or before July 11, 2025, indicating what redactions, if any, should be included in the public version of the Order.~~

Dated this 1st day of July, 2025.

John H. Chun

John H. Chun
United States District Judge

~~SEALED~~ ORDER DENYING MOTION TO
EXCLUDE EXPERT TESTIMONY - 24